## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06 CR 487 |
| v. | ) | Judge William J. Hibbler |
| | ) | |
| CHARLES FARINELLA | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT FARINELLA'S POST-TRIAL MOTION FOR
## JUDGMENT OF ACQUITTAL OR IN THE ALTERNATIVE, A NEW TRIAL

Defendant, CHARLES FARINELLA, by and through his attorney MICHAEL B. NASH,

pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure, and the Fifth and

Sixth Amendments to the Constitution of the United States, moves for judgment of acquittal, or

in the alternative, for a new trial.[1]

## I.    IMPROPER AND PREJUDICIAL ARGUMENT TO THE JURY

### A.    THE DEFENDANT AND HIS HIGH PAID LAWYER SHOULD NOT BE ALLOWED TO BUY JUSTICE.

The Sixth Amendment of the Constitution guarantees that "in all criminal prosecutions,

the accused shall have the assistance of counsel for his defence." Sixth Amendment United

States Constitution. The right to counsel is a fundamental ingredient of our criminal justice

system. "This right, fundamental to our system of justice is meant to assure fairness in the

adversary criminal process." *U.S. v. Morrison*, 449 U.S. 361 , 364, 101 S.Ct. 665,667, 66 L.Ed.

---

[1]    Before, during, and after trial, Farinella presented motions, made objections, and raised numerous legal issues. While Farinella does not seek to restate those arguments in detail, he does not abandon or waive those arguments for the purpose of these post-trial motions and expressly preserves and reasserts each argument herein, including those objections made orally in open court or in a written filing.

2d 564 (1981). So basic is it that in 1962 the United States Supreme Court extended this constitutional guarantee to indigents, stating that "(l)awyers in criminal cases are necessities not luxuries." *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed. 2d 799 (1962). The Seventh Circuit has also recognized the vital role an attorney plays in our adversary system of justice, "[a]n attorney is vital to a reliable trial." *Rodriguez v. Chandler*, 382 F.2d 670, 674 (7th Cir. 2004). Moreover, defense counsel is no less an officer of the court than the prosecutor and whether he is paid or appointed, it is his ethical obligation – not just his job – to zealously defend against the government's charge.

In a stunning effort to demean both defendant and his counsel, the prosecutor made the following plea to the jury:

> "Ladies and Gentlemen, don't let the defendant and his high-paid lawyer buy his way out of this."

Tr. 540.

Defendant objected, and the objection was sustained, but the irreparable damage was done. Implanted in the jurors' minds was the notion that the defendant and his "high-paid lawyer" were trying to buy defendant's way out by presenting a defense. The prosecutor's statement equated Farinella's exercise of his right to a trial and his lawyer's constitution obligation to defend him with buying "his way out of this." The comment was egregious, an affront to dignity of the Court, counsel and the legal profession, and a violation of the defendant's right to due process.

Notwithstanding that the Court sustained the objection, the prosecutor again told the jury that to acquit the defendant was tantamount to allowing Farinella and his lawyer to "buy" justice.

> MS. SORENSEN: Black and White in our system of justice, ladies and gentlemen. You have to earn justice. You can't buy it.

2

Tr. 541.

These comments were obviously improper and there was no justification for them. In

*U.S. v. Morgan*, 113 F.3d 87, 89 (7th Cir. 1962) the Seventh Circuit framed the issue as follows:

> The relevant question is whether the prosecutors' comments so infected the trial with
> unfairness as to make the resulting conviction a denial of the due process. *Darden v.*
> *Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464 (1986).

In *Morgan* the prosecutor asked the jurors to imagine themselves in a witness' shoes by asking

them how they, the jurors, would feel if they were called liars. *Morgan* at 88. The Court noted

that, although improper, the prosecutor's remarks did not "misstate the evidence" and was not

aimed at the defendant's "constitutional right," again citing *Darden v. Wainwright*. *Morgan* at

91. The fact that comments by the prosecutors in *Darden & Morgan* did not impact a

defendant's due process rights or misstate the evidence tipped the decision in the government's

favor in both cases. But here that factor – an attack on two of defendant's fundamental

constitutional rights, the right to a trial and the assistance of counsel in that trial, coupled with

the attack on counsel's integrity, i.e., that he was trying to buy justice, weighs heavily in favor of

a new trial. In *Morrison*, the Supreme Court made specific mention of its response in earlier

cases when "governmental conduct had rendered counsel's assistance to the defendant

ineffective. *Morrison* at 667, 364. *Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424

(1977); *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed 2d 592 (1976); *Herring v.*

*New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); *Gilbert v. California*, 388 U.S.

263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade*, 388 U.S. 218, 87 S.Ct.

1926, 18 L.Ed.2d 1149 (1967); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12

L.Ed.2d 246 (1964). These cases recognized a fair and evenhanded justice system depends on

"the right to counsel." *Morrison* at 667, 364. The violation of this right requires a new trial.

In *Bruno v. Rushen*, 721 F.2d 1193, 1194 (9th Cir. 1993) the court reversed a defendant's conviction because the prosecutor was "openly hinting" that the accused's hiring of counsel "was in some way probative of the defendant's guilt." Here there was no "hint." The prosecutor flat out accused defendant and his "high-paid lawyer" of attempting to buy justice by merely defending against the charges. Such comments severely undermine an accused's right to defend against the charges:

> Even though such prosecutorial expressions of belief are only intended ultimately to impute guilt to the accused, not only are they invalid for that purpose, they also severely damage an accused's opportunity to present his case before the jury. It therefore *is an impermissible strike at the very fundamental due process protections that the Fourteenth Amendment has made applicable to ensure an inherent fairness in our adversarial system of criminal justice. Id. Furthermore, such tactics unquestionably tarnish the badge of evenhandedness* and *fairness* that normally marks our system of justice and we readily presume because the principle is so fundamental that all attorneys are cognizant of it. Any abridgment of its sanctity therefore seems particularly unacceptable."

*Bruno* at 1195 (emphasis added).

Similarly, in *U.S. v. Frederick*, 78 F.3d 1370, 1380 (9th Cir. 1995), the court reversed the defendant's conviction when the "(p)rosecutor . . . implied that . . . seeking representation indicated the defendant's guilt." Here the prosecutor did NOT "IMPLY," she stated unequivocally that an acquittal was tantamount to letting defendant and his "high-paid lawyer buy his way out of this." This was not a comment on the evidence. It was an assault on the dignity of the court, and mockery of defendant's Sixth Amendment rights to a trial and the assistance of counsel at that trial.

These comments are akin to a prosecutor's assault on a defendant's Fifth Amendment right to silence. In *U.S. v. Morrision*, 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L Ed.2d 564 (1981) agents had elicited information from an indicted defendant represented by counsel. The defendant sought to have the indictment dismissed, claiming that the surreptitious interview had

4

deprived the defendant of effective assistance of counsel. The Court refused to dismiss the indictment, but rather "denied the prosecution the fruits of its transgression." The court reasoned that suppressing the information from the unconstitutional interview was sufficient to "neutralize the taint" and would "assure the defendant . . . effective assistance of counsel and a fair trial." *Morrison* at 365. The government would then be "free to proceed with a new trial." *Morrison* at 365. It also insured "that no prejudice, either transitory or permanent, to the ability of her counsel to provide adequate representation in (the) criminal proceedings." *Id.* Likewise, the Court here should deny the government the fruits of its transgression and grant defendant a new trial.

## B.     MISSTATEMENT OF THE EVIDENCE

The Government in its opening argument told the jury that Reeg had received the phoney/altered ACH letter from Farinella when Farinella employed him to put on the new labels. Tr. 485, 490 & 493. Reeg, the Court will recall, was the witness whose company was hired to affix the new labels to the 1.6 million bottles of salad dressing. Farinella's fax to Reeg, GX 19, is dated June 3, 2003. The fax states the labels WILL be sent to Reeg shortly. Reeg was not sure of the exact date he received the letter. He testified that he and Farinella spoke a couple of weeks before the project began. Reeg testified that he "had to have something from him (Farinella) saying it was legal BEFORE we could do it." Tr. 235. In other words, according to Reeg, he supposedly received the altered ACH letter from Farinella before he put the labels on the bottles.

In his final argument to the jury, Farinella pointed to Cindy Gatto's testimony that the phony/altered letter was not created until after the labels were put on the bottles. While Gatto did not fix a particular date, she testified that the alteration of the letter occurred AFTER the

labels were applied to the bottles of salad dressing and AFTER Division Sales customers received the relabeled bottles. Only afterwards when the customers and sales representatives started complaining about the new labels – was she instructed by Marks to create the altered letter. Tr. 182-184.

Q.      What happened after the labels were applied to the dressings?

A.      There were questions about why labels were attached to the bottles.

. . . .

Q.      Questions from whom?

A.      Sales staff, customers.

Q.      Were you instructed to do anything in response to those questions?

A.      Yes.

Q.      What was that?

A.      That was to provide a letter.

Q.      Who told you to provide a letter?

A.      Ross Marks did .

Q.      What did Ross Marks tell you about the letter that he wanted?

A.      He had originally given me a copy of a letter, the time that concerns were starting to come about. He asked me to alter that letter.

Q.      Now I'm showing you what's been admitted into evidence as Government Exhibit 5. Do you recognize this?

A.      Yes.

Q.      What is that?

A.      This is the original letter.

6

Q.    And by original letter, you mean the letter that Marks showed you?

A.    Yes.

Q.    After Ross Marks showed you this letter, what did he ask you to do?

A.    I filed it away for a period of time.  When the customers and sales representatives started to have concerns, he asked me to get that letter.  And that is when he requested that I make changes to it.

Q.    Did you make those changes?

A.    Yes.

Q.    And what did he do after you altered the letter?

A.    I kept it so it would be available for sales reps to pass along to any customers that may have concerns, and in some instances sent it out to customers directly myself.

Tr. 182-184.

This testimony on pages 182-184 is the government's direct of Gatto, not cross-examination.  Her testimony was unequivocal and clear.  Very simply, the letter was not created until after the bottles had been relabeled, shipped and received by the customers.  The first shipment, according to the Government's evidence, was shipped on June 26, 2003 from St. Louis, Missouri to a Dollar King Store in Chesapeake, Virginia.  In fact, the Government stipulated that the shipments began on June 26, 2003.  See GX 19, bates #1144 and Stipulation attached as Exhibit G.  Gatto's testimony was no surprise to the Government.  She gave the same account to the agent and the grand jury in a signed statement prepared by the prosecutor.  See attached Gatto grand jury statement, Exhibit A.

Nonetheless, in rebuttal the prosecutor told the jury that "there is no evidence," "that Cindy Gatto didn't create that letter until after the defendant provided those labels to Jeff Reeg."

7

Tr. 528. This was a gross misstatement of the government's own evidence. The uncontradicted evidence was that the letter was altered because the customers were complaining about new labels. How could Reeg have been given the letter if it was not even created until after the labels had been put on the bottles? This is not a rhetorical question. It goes to the heart of the government's case and establishes beyond any doubt that the prosecutor made a serious misstatement of the evidence.

The Court in *Morgan*, like the Supreme Court in *Darden v. Wainwright*, noted the significance of a prosecutor's misstatement of evidence, but declined to reverse Morgan's conviction because "the prosecutor's comments (did not) misstate the evidence." *Morgan* at 91. Here the prosecutor did precisely that and the Court should grant a new trial.

This misstatement of the evidence was exacerbated by the government's comments regarding Reeg's explanation as to why he had not produced the letter. Reeg testified that he gave the letter to his company's lawyer, but he could not remember the lawyer's name or firm. Tr. 231. To rebut the implication of the missing letter, the prosecutor told the jury the defense could have subpoenaed the lawyer. This was clearly disingenuous since, as noted above, Reeg had testified that he did not recall the name of the lawyer and until July 5, 2007 Reeg had never claimed to even have received a letter from Farinella.

What makes this suggestion to jury more onerous is that although the prosecutors had informed Farinella's counsel by letter dated July 5, 2007, that Reeg had stated for first time that he had received the altered ACH letter, the prosecutor's letter only stated that "Mr. Reeg could not locate the letter." See letter dated July 5, 2007, Exhibit B. Furthermore, the Agent's notes of the July 5, 2007 interview of Reeg states only that he "can't find" the letter. See Ex. C. There is nothing in the prosecutor's July 5, 2005 letter or the agent's notes of that interview regarding

8

Reeg giving the letter to a lawyer. Given his testimony at trial, if Reeg did not tell them on July 5, 2007 about giving the letter to a lawyer then his testimony was clearly perjurious. And, since defense counsel did not anticipate his perjury, there was no reason to believe that any subpoena to an unnamed attorney was needed; or even possible.

## C.     POISON

The prosecutor's rebuttal argument resurrected another allegation abandoned in the pretrial motion stage of this case. In his pretrial motions, defendant challenged the government's evidence as to illness and sought the dismissal of Count 5, which charged that the dressing had caused bodily harm. The government dismissed Count 5. Although the Court's ruling permitted the introduction of evidence of illness, the government chose not to present any such evidence. This decision was not surprising since every government witness testified there were no safety issues and there was no credible evidence of anyone getting ill. Against this background the prosecutor in a shameful effort to inflame the passions of jury against Farinella, told them that Farinella "isn't charged with poisoning people," but adding that although not charged, she did not "see them opening any of these bottles and taking a whiff." Tr. 541.

The obvious intention was to frighten the jurors and imply a safety risk from what she termed this "nasty" salad dressing. Tr. 525. This implication was completely unsupported by the government's evidence. The culmination of this effort to focus attention away from the evidence and the issues in question came when she told the jury that if Farinella is right then "we'd better grow our own food."

> "(I)f what Chuck Farinella did was business as usual in the food industry, I suggest that we all stop going to the grocery store right now and start growing our own food." Tr. P. 539.

9

Numerous cases have held that it is improper to appeal "to the jurors' emotions [by] inviting the jury to consider the social consequences of its verdict." *Morgan* at 90, citing *U.S. v. Seveson*, 3 F.3d 1005, 1015 (7th Cir. 1993). In *U.S. v. Cunningham*, 54 F.3d 295, 300 (7th Cir. 1995) the Seventh Circuit specifically stated:

> The government may not attempt to obtain a conviction by appealing to jurors to prevent future crimes by finding present guilt.

The salad dressing was absolutely safe. There was no evidence to the contrary. Thus, the Government's comments to the contrary did nothing more than appeal to the jurors' fears about deterring future conduct that would obviously impact them in their daily lives. See *U.S. v. Cunningham* at 301.

One might ask why the prosecutor sought to scare the jurors. Perhaps the answer is found in *Bruno v. Rushen.*

> Even more egregious, however, are attempts by representatives of the government to resort to these reprehensible means to shortcut their responsibility to ferret out all admissible evidence and use only that to meet their burden of proof. We fear resort to such conduct indicates either an absence of sufficient evidence to convict or reflects shoddy government efforts that have failed to unearth admissible evidence.

*Bruno* at 1195. In this context the Court will recall the numerous misstatements of law made to grand jury as set forth in Defendant's Reply to the Government's Omnibus Response to the pretrial motions in limine. From start to finish, the Government has twisted its paltry evidence and relied on fear, innuendo, and intimidation to convict Farinella, rather than facts and evidence.

## II.    THERE ARE NO STATUTES OR FDA REGULATIONS GOVERNING THE CHANGING OF "BEST WHEN PURCHASED BY" DATES

There are no FDA regulations or statutes which govern the dating of ordinary food products. This was the focus of defendant's pretrial motion in limine. Citing numerous FDA

publications, the defendant argued that there was no "federal law" "nor any FDA regulation" that governed "who or on what basis the dating on a product such as salad dressing may be CHANGED OR EXTENDED." Motion, p. 4. emphasis not in original.

The government responded that it did not oppose defendant's motion, but stated that "it intends to introduce evidence of the policy behind an industry practice." Omnibus Response, p 5. It described the industry practice at length, but made NO MENTION of any regulation or law that authorized the FDA to regulate a change to a "best when purchased by" date.

On July 2nd, a week before trial, acting on the basis of defendant's memorandum and the government's response, the court granted defendant's motion with the proviso that the government could introduce evidence of the so-called industry standard to which defendant objected.

The trial began on July 9, 2007. In his opening statement, Farinella's counsel, in reliance on the court's ruling, told the jury that there were no laws or FDA regulations governing the dating of ordinary food products.

On Thursday, July 12, 2007 the government suddenly changed its position. It added a new witness, Richard Harrison, Director of Compliance for the Chicago office of the FDA. According to the prosecutor, Harrison would testify that the FDA did regulate any change of a "best when purchased by" date, requiring "scientific data, including "shelf life studies (and) testing product for pathogens." Absent this data "the request to relabel would have been denied." See attached letter dated July 12, 2007 and Tr. 207. This was a material change in the government's position.

No authority, statute or FDA regulation was ever cited to support this contention. Of course, if there was such a regulation or statute the Government would have cited it in its pre-

11

trial response. But there is no statute or FDA regulation. This is confirmed by the review of the numerous bulletins and guidance memos on the various FDA web sites cited in defendant's motion in limine and the statutes and FDA regulations.

Over defendant's objection, the Court allowed Harrison to testify that the FDA regulated who and how a "best when purchased by" date is changed. Tr. 380. According to him, if there had been a request to change such a date, scientific data would be required by the FDA to approve the new date.

> Q.    Mr. Harrison, based on your training and experience, had such a request been made to the FDA, what would the FDA's procedure have been?

> Mr. Nash: Objection, Judge.

> The Court: Overruled

BY THE WITNESS:

> A.    The FDA would have asked for scientific data, laboratory finished product analysis, studies to show that the product would be safe, if that was the request.

BY MS. SORENSEN:

> Q.    Would that scientific data be required in order for the FDA to approve the relabeling of a new expiration date?

> A.    Yes, it would

Tr. 380.

Shortly thereafter, Harrison testified that he did not know what the FDA said about "best when purchased by" dates. "That's not an FDA term." Tr. 384. According to Harrison, "the FDA doesn't have the authority to regulate expiration dates." If it is a food, "the owner of a product decides when it is best purchased by." Tr. 385.

> Q.    If I was to call the FDA up and say, what are the FDA regulations with regard to the dating if regular food products, what would I be told?

12

     A.    That the FDA doesn't have the authority to regulate the expiration dating at the present time.

Tr. 385.

     If "the FDA doesn't have authority to regulate the expiration dating of food," and if "it is the responsibility of the owner of the food in interstate commerce to ensure" compliance with FDA regulations, which was Harrison's testimony, what is Harrison's basis for his conclusion that one must seek FDA approval to change a "best when purchased by" date? What statute mandates "scientific data" and so-called "laboratory finished product analysis"? What is meant by "scientific data" and "laboratory finished analysis"? Where are these requirements set out and defined? The answer is that there are NO such requirements.

     How does one reconcile Harrison's testimony that if one were to contact the FDA with a question about labeling of an ordinary food product, he would be told that the "the FDA doesn't have authority to regulate the expiration dating at the present time?" Tr. 385. How does one reconcile Harrison's testimony with the government's assurance in its Omnibus Response that "no such regulation exists?" Omnibus Response, p. 4. The answer to each of these questions is found in the government's pre-trial pleading that

     a)    "[t]he Government has no intention of introducing evidence of a federal regulation where NO SUCH Regulation Exists." Government's Omnibus Response p. 4.

     b)    "[t]he Government does not oppose defendant's motion to preclude evidence of FDA regulations about dating of food." Government's Omnibus Response, p. 5.

     Harrison's testimony is inherently inconsistent and unsupported by any statutes or FDA regulations. There are no FDA regulations governing or approval required to change a "best when purchased by date." This is precisely what defendant's pre-trial motion in limine had addressed. The motion specifically addressed "the dating on food products such as salad

dressing" and when it "may be CHANGED OR EXTENDED." Motion In Limine, p. 4. The motion could not have been clearer and the Court granted the motion. Nothing has changed. And there was no reason for the court to change its ruling and permit the suspect testimony of Harrison.

"Best when purchased by" dates relate to taste and flavor, not safety, not nutritional value or health claims which do come within the purview of the FDA. The FDA's own web site, FDA/CFSAN state the "legal FDA requirements affecting . . . (the) distribution of food. It states:

> It is the responsibility of the owner of the food in interstate commerce to ensure that the article complies with the provisions of the FD&C Act, the Fair Packaging and Labeling Act (FPLA), and their implementing regulations. In general, these Acts require that the food product be a safe, clean wholesome product and its labeling be honest and informative.

Exhibit D, p. 2.

In an FDA List of Terms at www.fda.gov, (Exhibit E) the FDA defines 'best if used by' as "a calendar date . . . as to flavor and quality, not a purchase or safety date." Other publications say the same. *Food Product Dating and Storage Times,* Ralph Meer, (College of Agriculture and Life Sciences, The University of Arizona) (Exhibit F); *Fact Sheet on Food Labeling* from United States Department of Agriculture (USDA) Food Safety and Inspection Service ("a 'best if used by (or before)' date is recommended for best flavor or quality. It is not a purchase or safety date."); *see also, Expiration, Use-by and Sell-by Dates,* found at www.homecooking.about.com. Another publication states only that "retailers cannot change dates on products packaged under federal inspection." *See Food Product Dating and Storage Times*, p. 2, Exhibit H. Safety is the purpose of the FDA – not quality, taste, flavor, color or texture of a product. Quality, taste, flavor, color and smell of a product is subject to an

individuals own sense of smell and taste. It is precisely because taste and smell are subjective that the FDA does not regulate it.

Harrison's testimony was legally inaccurate in another respect. Harrison testified that any change of a "best when purchased by" date is misbranding. Tr. 380-381. He was dead wrong. It is misbranding only if the labeling was materially "false or misleading." As stated in the statute, 21 USC 343(a), and the indictment, a food is only misbranded if the labeling is false or misleading. This misstatement of law specifically contradicted the Court's instruction to the jury regarding the elements of misbranding. The prosecutor compounded the error of Harrison's misstatement of law by telling the jury "that putting a new expiration date over an old one without permission of the FDA is misbranding." Tr. 539. She repeated this inaccurate statement of the law again. "To change (the date) is misbranding." Tr. 540. Misbranding requires more than merely changing the date.

### III.   HEARSAY

Harrison's testimony regarding the FDA database was inadmissible hearsay. He testified that a check of the database did not reveal any request regarding the relabeling of salad dressing by Farinella, his co-defendant Marks or their companies. Tr. 379-380. However, Harrison was only familiar with the database "in general," and admitted "I don't know how it is maintained." He has never seen this database, and does not have access to it. He only knows what someone told him. He has no personal knowledge, and could not lay any foundation for the introduction of what was clearly hearsay. Tr. 381-382.

In other words, the government was offering an out of court statement by someone else to prove the truth of the statement. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the

matter asserted." Rule 801, Fed. Rules of Evidence. Harrison's hearsay testimony went to the heart of the government's accusation that Farinella, Marks, AMG and Division Sales did not have permission to change the dates on the salad dressing and that the FDA regulated the dating of food. Virtually all of Harrison's testimony was hearsay, particularly his testimony about the contents of a database of which he knew nothing and about changing "a best when purchased by" date which was a term he also knew nothing about since it was not an FDA term. Thus, defendant's objections should have been sustained and Harrison's hearsay should have been excluded. Failing to do so caused error that can only be cured with a new trial or a judgment of acquittal.

## IV.    VARIANCE

In its response to defendant's pre-trial motion regarding no FDA regulations as to the dating of food, the government impermissibly amended the indictment. The indictment had charged the bottles were "relabeled with false expiration dates that extended the sell-by date on the bottles by approximately one year." Indictment, ¶ 3, p. 2. Its response stated that the relabeling was criminal because dating was used as a code "for the purpose of tracking a particular batch of product in the event of a safety issue and the new label covered the code." Omnibus Response, p. 4. This was a completely new theory. This theory was significantly different from that charged in the indictment.

The fraud identified in the indictment was that Farinella extended the "best when purchased by date" by putting false expiration dates on the bottles to deceive customers. The "materially false and fraudulent pretenses" were the false expiration dates, not labeling over a code established by an "industry-wide practice." Indeed, if this had been the charge, the government would have to prove that Farinella intended to violate this "industry-wide practice."

This would require proof that he knew of the "industry-wide practice" and that in labeling over the old date, he did not act through ignorance, mistake or accident, i.e., that he acted "knowingly." According to the indictment the false dates were put on the bottles in order to deceive Farinella's "unsuspecting" customers so as to increase the likelihood that they would buy the salad dressing. There was nothing in the indictment about a code.

The government's shift in theory constructively amended the indictment (or, at a minimum, constituted a prejudicial variance) and requires a new trial. A court must ensure that a defendant is tried solely on charges that contained in the indictment brought against him. *See, e.g., Stirone v. United States*, 361 U.S. 212, 217 (1960); *United States v. Pigee,*, 197 F.3d 879, 886 (7th Cir. 1999). To avoid violating the Fifth Amendment right to indictment by a grand jury, "the allegations in the indictment and the proof at trial must match in order 'to insure that the defendant is not subject to a second prosecution, and to give the defendant reasonable notice so that he may prepare a defense.'" *United States v. Folks*, 236 F.3d 384, 390 (7th Cir. 2001) (quoting *United States v. McKinney*, 954 F.2d 471, 480 (7th Cir. 1992))." "A constructive amendment to an indictment occurs when either the government . . . the court . . . or both, broadens the possible bases for conviction beyond those charges presented by the grand jury." *Folks*, 236 F.3d at 390 (quoting *United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1998)); *see, e.g., United States v. Willoughby*, 27 F.3d 263, 265 (7th Cir. 1994).

CONCLUSION

For the foregoing reasons, and for the reasons stated in Farinella's prior arguments and pleadings, the Court should grant a judgment of acquittal. In the alternative, the Court should grant Farinella a new trial.

Respectfully submitted,


_____s/  Michael B. Nash_____
Michael B. Nash


**Michael B. Nash**
53 West Jackson Boulevard
Suite 620
Chicago, Illinois  60604
(312) 236-8788
*Attorney for Defendant*
*Charles Farinella*

18

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing DEFENDANT'S MOTION FOR JUDGMENT

OF ACQUITAL OR IN THE ALTERNATIVE A NEW TRIAL was served on

August 16, 2007 in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.2(a), and the

General Order on Electronic Case Filing (ECF) pursuant to the district court's system as

to ECF filers.

s/   Michael B. Nash

**MICHAEL B. NASH**
53 West Jackson Boulevard, Suite 620
Chicago, Illinois 60604
(312) 236-8788